**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kimbel A. LeMAUX, Defendant–Appellant.**

**No. 92–10007.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 1, 1993.

Decided May 28, 1993.

**2.** SCI also asserts that certain deadlines in its approved reorganization plan supplanted the § 546(a) statute of limitations. We choose not to consider this issue because it was raised for the first time in a petition for rehearing. *See Escobar Ruiz v. I.N.S.,* 813 F.2d 283, 285–86 (9th Cir.1987). Accordingly, we take no position on this issue.

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, CA, for defendant-appellant Kimbel LeMaux.

Thomas E. Flynn, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee U.S.

Before FLETCHER, REINHARDT and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Kimbel LeMaux appeals his conviction of conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848. A CCE violation requires, *inter alia,* proof that the accused took part in three or more predicate offenses and supervised five or more persons in the alleged illegal narcotics activity. *United States v. Hernandez–Escarsega,* 886 F.2d 1560, 1573 (9th Cir.1989), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). We have dealt with other aspects of this case in an unpublished memorandum issued separately. Here we focus on LeMaux's contention that the jury should have been instructed that it must agree unanimously on the supervisees and on predicate acts necessary to constitute a continuing criminal enterprise. We affirm the conviction.

## EVIDENCE

The evidence submitted at trial by the government showed the following:

Between 1982 and 1988 Kimbel LeMaux (sometimes known simply by his unusual first name Kimbel or as K) was in the business of buying and selling drugs, in particular cocaine and marijuana in quantity. As to the specific predicate acts charged in the indictment, three of which the government had to establish to convict him of conducting a continuing criminal enterprise, the evidence was as follows:

*First,* that LeMaux distributed a large quantity of cocaine in 1982 and 1983. Robert Gustav ("Gus") Sand testified that in 1982 he began buying cocaine on credit from LeMaux; in the jargon of the trade LeMaux fronted him cocaine. The price was $57,000 a kilo. Sand would pick up a kilo from Paul Inrig somewhere off Interstate 80, either at Spenger's Fish Grotto in Berkeley, California or at another restaurant conveniently close to the freeway. Sand would pay LeMaux at his house in Fair Oaks, California, or pay Inrig at one of the restaurants. At the end of a year of this operation Sand owed LeMaux $350,000. Sand had not been keeping records but LeMaux and Inrig told him he owed the money, and he saw a ledger at LeMaux's house in Fair Oaks. The amount owed by Sand reflected a purchase of at least six kilos of cocaine from LeMaux.

After Sand had been informed of his debt, LeMaux and Carl Moore appeared one night at his apartment in Davis, California at midnight. Sand understood that Moore's job was to collect money that wasn't paid. After some discussion the two men told Sand to accompany them to Moore's house. Nothing happened to Sand after he explained that he was developing a smuggling scheme to "bring a load into the country and pay my bill."

*Second,* that in approximately 1984 LeMaux possessed with intent to distribute in excess of one ton of marijuana. Carl Leslie ("John–John") Moore, son of LeMaux's codefendant, Carl Dexter Moore, testified that in the spring of 1984 his father had no job except selling drugs for LeMaux. His father's house on Deer Valley Road in Sacramento, California had stash areas, one of which contained at one time at least 60 pounds of marijuana and a safe in which he saw three kilos of cocaine. A truck called "Whitey," which LeMaux said had been specially prepared for smuggling, sometimes was driven to the house.

At LeMaux's own house in Fair Oaks John–John participated in a discussion of offloading marijuana at John–John's grandparents' house on Cantrell Mountain on the northern shore of Lake Comanche in Calaveras County, California. John–John saw his father give money to his grandparents, assuring that they would be away on vacation when the marijuana arrived.

Dennis F. O'Brien testified that beginning in 1983 he worked for Carl Moore as a collector of bad drug debts owed to LeMaux and his group. In April 1984, at Moore's direction, he drove the two-ton truck called Whitey, which had a four-foot stash area, and brought it to a broken-down truck on Highway 88 in California. From this truck he helped unload 100 bales of marijuana; he estimated the amount to be in tons. He delivered the marijuana to Cantrell Mountain where Moore's mother lived. A few days after the stash at Cantrell Mountain, a truck was driven to a warehouse in Rancho Cordova, California, where Moore, LeMaux, O'Brien, Gary Owens, "and a couple of Colombians or Mexicans" unloaded it. Later O'Brien drove one truck load of marijuana from the warehouse to Cantrell Mountain. O'Brien and John–John's testimony established that LeMaux had possessed over a ton of marijuana with the intent to distribute it.

*Third,* that beginning in approximately January 1983 and continuing up to February 1986, LeMaux distributed approximately 92 kilos of cocaine to Gary Jones. Gary Jones testified that in early 1983 he was called by a friend, Steve Coppedge, who offered to get him cocaine to sell. Coppedge introduced him to LeMaux "to hook him up to get some cocaine." LeMaux was known to Jones as K. Shortly thereafter Jones was called by a person who said he would speak to K and then meet with Jones and deliver a kilo of cocaine at Raleys parking lot at Madison and Hazel streets in Sacramento. The meeting took place and Jones met Tom D'Anna, who gave him a kilo in a small sports bag. The kilo was fronted to him. At the time a kilo was worth $35,000. Jones broke it open and sold it.

For the rest of 1983 and most of 1984 Jones continued to buy cocaine from D'Anna. In 1983 there were five or six meetings at each of which Jones bought one kilo. They would usually meet in the parking lots of restaurants or on a freeway. In 1984 Jones met with D'Anna approximately six times to buy at least a kilo each time. Jones delivered some of the money he owed to LeMaux's house in Fair Oaks. In 1984 Jones also sold three or four kilos at a time to Joe Watterson. He obtained these kilos from D'Anna, purchasing in all 25 to 35 kilos from D'Anna in 1984. Jones' testimony established that LeMaux had distributed at least 31 kilos of cocaine in 1983 and 1984.

*Fourth,* that in early 1985 LeMaux possessed with intent to distribute approximately 50 kilos of cocaine. This possession followed a meeting of LeMaux with Humberto Vega. Vega, who testified, is by his own admission one of the highest ranking persons in a Colombian drug cartel to testify in the United States. According to him, he was the twenty-eighth drug dealer to be extradited to the United States from Colombia. He now believes himself in danger of being killed by Colombian drug dealers for his cooperation with the American government.

Vega began working in 1980 in the cocaine business of the Builes Family, a group that was big in Medellin. He eventually was in charge of transporting drugs for the Builes from Colombia to the United States.

Vega described four trips that he arranged with Gus Sand beginning in 1984. He and Sand arranged to load an American plane in Colombia to its capacity of 450-500 kilos of cocaine. The plane was flown to Mexico where Sand paid Mexican army soldiers in cash to guard the airstrip so that the drug dealers would not be ripped off. The cocaine was then loaded into a house trailer with a false flooring. The car of the trailer was driven by an elderly couple recruited by Sand. In this way cocaine was brought into the United States. Vega was regularly accompanied by his brother-in-law Ramon Perez, an ex-Miami police officer, who acted as Vega's translator and took care of the money, and by Perez's friend, George Canizares, another ex-policeman from Miami. Sometime in late 1984, Sand arranged for Vega to meet LeMaux, known to Vega only as Kimbel. The meeting took place in the Los Angeles area. Vega went under the *nom de guerre* of David Posada. Kimbel offered to buy the planeload of 500 kilos, but Vega was able only to offer him his own share of approximately 75 kilos, which LeMaux agreed to buy. Vega got almost $250,000-300,000 for each of the loads he brought in and sold to LeMaux. That a meeting between Vega and LeMaux took place was confirmed by Vega's aides, Perez and Canizares, and by Sand. According to Sand he also personally delivered 30 kilos, assigned by Vega to him, to LeMaux at Morro Bay in early 1985; LeMaux sold it for him and credited him with the proceeds. Sand's testimony alone shows LeMaux possessed 30 kilos of cocaine with the intent to distribute it in early in 1985.

*Fifth,* that in approximately April 1985 LeMaux possessed 50 kilos of cocaine with intent to distribute. Vega, Sand and Perez all testified to a repetition of the cocaine shipment of about 500 kilos from Colombia to Mexico by plane and by trailer to Los Angeles where LeMaux bought Vega's share, amounting to about 75 kilos.

*Sixth,* that in approximately June 1985 LeMaux possessed with intent to distribute approximately 50 kilos of cocaine. The same witnesses testified to the same process of delivery and payment.

*Seventh,* that from the beginning of 1985 through June 1988 LeMaux distributed approximately 2 kilos each month for a total distribution of approximately 84 kilos of cocaine. John-John Moore testified that in the spring of 1984 his father took him to a meeting at LeMaux's house with LeMaux and Paul Inrig. His father explained that he was going to be on vacation and that while he was gone, John-John would deliver the kilos for him to Jerry Silva, whose alias was Jesse Vega. LeMaux approved a price of $42,000 a kilo and a commission for John-John of $1,000. The arrangements were made for John-John to pick up the cocaine from Inrig at Spenger's restaurant in Berkeley.

Shortly after this meeting, at LeMaux's direction, John-John drove from Sacramento to Berkeley, met Inrig at Spenger's and picked up two kilos of cocaine from him in the parking lot. He delivered the kilos to Jerry Silva in his mountain habitat below Sommerset and above Placerville, California.

After his father returned from his vacation, he and his father quarreled but were then reconciled. Shortly after this reconciliation Brad Green, a person he knew, arrived at his father's house; Green paid Moore, Sr. some money and Moore, Sr. delivered one or two kilos of cocaine to Green. On a second occasion Green arrived at the same house and delivered money to John-John's father. On this occasion his father gave Green marijuana from the stash location between the floors. A little later in 1984 John-John and his father met Green and LeMaux at the Holiday Inn in Sacramento at Madison and Highway 80. The purpose of the meeting was to deliver kilos of cocaine to Green. Green received four kilos. John-John took one which he cut up and sold in small quantities to several friends he had gone to high school with.

Somewhat after this period John-John began to pick up cocaine regularly from Inrig: "I'd go see Kimbel, and he would tell me to meet Paul at his house at Lake Comanche on a certain day." The cocaine would be fronted to John-John. He usually bought one or

two kilos, occasionally three. In the period late 1984 through the middle of 1985 he picked up kilos from Inrig approximately five times. John–John took the kilos to Jerry Silva and to Brad Green, occasionally keeping a kilo for himself to break down and sell. The price paid for the kilos by John–John varied from the high 30 thousands to the low 40 thousands. If he broke the kilo down he could get 45 ounces to sell at $1,500 an ounce. John–John paid the money he owed either to LeMaux or occasionally to Inrig.

At the beginning of 1985 John–John picked up a kilo of cocaine from LeMaux at LeMaux's house. That was something unusual as LeMaux did not like to have drugs at his house. A second unusual occasion occurred a little later when Inrig delivered six kilos of cocaine to John–John's house. John–John accepted one or two kilos and Inrig took away the remaining four.

In 1985 John–John met Tom D'Anna. He was introduced to him by LeMaux. LeMaux told him that Tommy was going to be taking care of things for him for a while. As a result of instructions from LeMaux, John–John met D'Anna at a restaurant in Sonoma, California in the summer of 1985 and picked up cocaine from D'Anna. The amount was one to three kilos at a time. From 1985 to 1987 John–John continued to pick up cocaine from D'Anna. They made their arrangements through pay phones that they had selected in advance.

The last time John–John picked up a kilo it was from Bobby Juarez in 1987. The contact with Juarez was made at LeMaux's direction: "Bobby's going to be giving you a call." LeMaux and John–John discussed the price in advance and agreed that since the price had dropped it would be in the low twenties or high teens. Two days later he got the call from Juarez. As a result of the call they met at a restaurant in Sacramento. Juarez delivered two kilos of cocaine in the parking lot. One kilo John–John sold to Green and the other he cut up for himself.

John–John's testimony showed LeMaux from 1985 through 1987 distributing at least 20 kilos of cocaine.

## PROCEEDINGS

At LeMaux's trial the above evidence was established by the testimony of the following persons who had participated in the cocaine business of LeMaux: John–John Moore, Dennis O'Brien, Gary Jones, and Gus Sand. As to the cocaine that came from Mexico the evidence was provided by Humberto Vega, Raymond Perez, George Canizares, and Gus Sand. All of these witnesses were subject to cross-examination. It was shown that each had been deeply involved in the drug business; that each had profited from it; that each had been a user of drugs; that each had been apprehended by the government; that each had plea-bargained; and that each had reason to cooperate with the government at this trial.

The prosecutor in his closing argument told the jury that they could consider the following as LeMaux's supervisees: Paul Inrig; Carl Moore; Tom D'Anna; Jerry Silva; Gus Sand; John Moore; Bobby Juarez; Gary Jones; Joe Watterson; Dennis O'Brien; and Brad Green. The prosecutor set out the seven predicate acts in the indictment as violations as to which the jury must, to convict, agree on three. LeMaux made no request for a unanimity instruction, either as to the predicate acts or as to the supervisees. He was convicted of conducting a continuing criminal enterprise.

LeMaux appeals, alleging that the court sua sponte should have instructed the jury that it must be unanimous on the predicate acts and on the supervisees. He urges that our decision in *United States v. Jerome*, 942 F.2d 1328 (9th Cir.1991) requires reversal of his conviction.

### ANALYSIS

A. *Supervisees*

■ *Jerome* is inapposite. Though the holding in *Jerome* required a unanimity instruction for supervisees, it is expressly limited to a situation where some of the supervisees, presented as such by the government to the jury, could not legally have been supervisees. *Id.* at 1331. Each of those identified by the government as possible supervisees here were eligible.

Paul Inrig worked immediately for LeMaux and was repeatedly associated with him in the distribution of cocaine. Gus Sand was a distributor for LeMaux; the fact that he was also a supplier for him in 1985 does not change his earlier status. Carl Moore was both a distributor of drugs and a debt collector for LeMaux. Through Moore, LeMaux employed Dennis O'Brien and John–John Moore in LeMaux's cocaine business. The latter also worked directly for LeMaux. Gary Jones worked as a distributor for LeMaux directly and for Tommy D'Anna, a LeMaux employee. Bobby Juarez was also a LeMaux employee and supplied Jones. Jerry Silva was a distributor for LeMaux, who was supplied by John–John Moore; so were Brad Green and Joe Watterson. It was not plain error to fail to give the unanimity instruction. *Jerome* has no application. *United States v. Garcia,* 988 F.2d 965 (9th Cir. 1993).

### B. Predicate Acts

■ As to the contention that there should have been an instruction on unanimity by the jury on the predicate acts, we have stated that it is "the better practice" to give such an instruction. *Hernandez–Escarsega,* 886 F.2d at 1573. Undoubtedly, we have power in our supervision of the federal courts to require the instruction. *United States v. Rubio–Villareal,* 967 F.2d 294, 297 (9th Cir.1992). Indeed it would be "the better practice" to give a unanimity instruction concerning supervisees as well. Following the precedent of *Hernandez–Escarsega,* however, we need not decide this question when the absence of such an instruction was harmless.

In *Hernandez–Escarsega* we reviewed the evidence and found that the jury had eleven possible predicates presented to it. On two of them the jury convicted the defendant separately and so must have agreed unanimously as to them. As to the other nine offenses we held that "the co-conspirators involved testified in detail as to these events and the evidence was overwhelming." *Hernandez–Escarsega,* 886 F.2d at 1572. It was, consequently, "inconceivable" that the jurors would not have found that the offenses had been committed. *Id.*

A similar conclusion must be reached in this case. The coconspirators testified in detail as to the offenses in which they were involved with LeMaux. They showed a knowledge of the principal actors and the principal locations and the modus operandi of LeMaux's cocaine business. True, because of one or another's character, habits, or motives a jury could have disbelieved this or that government witness. As in *Hernandez–Escarsega,* however, the evidence here was straightforward, generally consistent, and powerfully incriminating. There is no reason in this case to question the jury's apparent credibility determinations. Evidence of each of the seven predicate acts was overwhelming.

■ There are some discrepancies in the testimony of the government witnesses, especially as to the key meeting of LeMaux with Vega. Perez puts it in August 1984, Vega in early 1985. The numbers and names of the participants vary, as does the name of the hotel. These variations affect the witnesses' credibility, *see* 3A John H. Wigmore, *Wigmore on Evidence* § 1005 (1985), and were for the jury to weigh. But all the witnesses agree that the meeting between Vega and LeMaux took place, and the time and location differences are not fatal. In a famous biblical celebration of a judge, Daniel distinguished himself by trapping the two lecherous elders who disagreed as to which tree they saw Susanna under. The discrepancy was their undoing and helped make Daniel famous. *Daniel* 13:53–59 (The New American Bible). But now disagreement on detail is understood to be a mark of honesty and read as an indication that the witnesses have not been coached in advance. The inconsistencies were not essential. *See* 1A *Wigmore on Evidence* § 135.

■ It is true, of course, that at least five of the predicate acts occurred more than five years prior to the grand jury's indictment of LeMaux. Ordinarily these facts would raise the question of the appropriate application of the statute of limitations in CCE cases. The statute of limitations, however, is an affirmative defense which is waived if not raised at trial. *United States v. Akmakjian,* 647 F.2d 12, 14 (9th Cir.), *cert.*

*denied,* 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 380 (1981). LeMaux asserted the statute of limitations as a defense to both Counts I and III. He chose not to employ the defense as to the CCE charge. Accordingly, any available defense based upon the statute of limitations was waived.

■ The variances between the amounts of cocaine charged in the indictment and the amounts proved at trial did not prejudice LeMaux's substantive rights and so were not fatal to the prosecution's case. In *United States v. Hazeem,* 679 F.2d 770, 773 (9th Cir.), *cert. denied,* 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982), the Ninth Circuit held that a variance between the amount of embezzled funds charged in the indictment and the amount proven at trial was not fatal. The indictment "was sufficiently explicit to inform Hazeem of the charges against him...." *Id.* at 774. Similarly, the Fifth Circuit held in *United States v. Guerra–Marez,* 928 F.2d 665, 673 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 322, 116 L.Ed.2d 263 (1991), that a variance between the amount of the quantity of heroin alleged in the indictment and the amount proven at trial was not fatal. The defendant's substantial rights were not prejudiced by the variance. *Id.*

LeMaux's conviction of conducting a continuing criminal enterprise is **AFFIRMED.**