**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

FREDY OSWALDO GAMEZ REYES,
AKA Luis Enrique Aguirre, AKA
Douglas Omar Castillo, AKA
Chapo, AKA Freddy Oswaldo
Gamez, AKA Freddy Oswaldo
Gamez-Reyes, AKA Carlos Lopez,
AKA Carlos Ramirez,
*Defendant-Appellant*.

No. 13-50086

D.C. No.
2:12-cr-00020-
SJO

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
June 3, 2014—Pasadena, California

Filed November 21, 2014

Before: Stephen Reinhardt, Raymond C. Fisher,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

## SUMMARY[*]

### Criminal Law

The panel affirmed a sentence for harboring and concealing illegal aliens for financial gain.

The panel held that the district court applied the proper legal standard and did not clearly err in applying an enhancement, pursuant to U.S.S.G. § 2L1.1(b)(4), for harboring unaccompanied minor aliens, when the district court looked at the particular circumstances of this alien smuggling ring and the defendant's role within it to conclude that it was reasonably foreseeable to the defendant that unaccompanied minors would be present. Rejecting the defendant's contention that the district court's finding did not comport with due process, the panel held that the undisputed facts upon which the district court relied bear sufficient indicia of reliability.

Upholding the district court's imposition of an enhancement pursuant to U.S.S.G. § 2L1.1(b)(8), the panel held that the district court did not clearly err in finding that this particular smuggling organization detained aliens both in connection with a demand for payment and through coercion or threat, and in finding that such detention was reasonably foreseeable to the defendant.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Marisa Conroy (argued), Law Office of Marisa L. D. Conroy, Encinitas, California; Michelle Anderson Barth, Burlington, Vermont, for Defendant-Appellant.

Kerry C. O'Neill (argued) and David M. Herzog, Assistant United States Attorneys; Robert E. Dugdale, Assistant United States Attorney, Los Angeles, California, for Plaintiff-Appellee.

**OPINION**

MURGUIA, Circuit Judge:

Fredy Oswaldo Gamez Reyes pleaded guilty to six counts of harboring and concealing illegal aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(B)(i).[1] The district court imposed a within-guidelines sentence of ninety-six months' imprisonment and a three-year term of supervised release. On appeal, Gamez Reyes claims that the district court erred in applying a two-level sentencing enhancement, pursuant to U.S.S.G. § 2L1.1(b)(4), for harboring unaccompanied minor aliens, and a two-level sentencing enhancement, pursuant to U.S.S.G. § 2L1.1(b)(8)(A), for involuntarily detaining aliens through coercion or threat or in connection with a demand for

---

[1] We use the term "illegal aliens" because that is the terminology used in the indictment, plea agreement, and judgment of conviction.

payment.**[2]**  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

## I.  BACKGROUND

Between May 2008 and March 2011, Gamez Reyes participated in a large-scale alien smuggling operation that smuggled approximately 2,000 aliens annually into the United States and harbored them in stash houses in southern California until they paid a fee.  Typically, the aliens paid a portion of the smuggling fee in their country of origin, and after they arrived in the United States their families paid the remainder of the fee on the aliens' behalf.  Gamez Reyes was in charge of obtaining and renting the stash houses, overseeing the maintenance and operation of the stash houses, and collecting smuggling fees from family members in exchange for the release of the aliens.  Gamez Reyes worked directly with the leader of the smuggling ring, known as "Honda."  Under Honda's direction, Gamez Reyes retrieved smuggling fees from Western Union or MoneyGram and delivered the money to Honda in person; in exchange, Honda gave Gamez Reyes between fifty and one-hundred dollars per transaction.  Gamez Reyes also personally collected fees from family members or directed other members of the smuggling ring to pick up the fees.

Immigration and Customs Enforcement ("ICE") agents began investigating the alien smuggling ring on July 27, 2009, after two female aliens inside one of the ring's stash houses in Compton, California, handed a note to children standing outside the house's barred window.  Written in

---

**[2]** We address Gamez Reyes's other claims in an unpublished memorandum disposition filed concurrently with this opinion.

Spanish on a piece of toilet paper, the note read, "Do me a favor and call this number. Don't call the police please! We are immigrants and we cannot leave. May God grant you blessings." The women later explained to ICE agents that they wrote the note because one of the smugglers acting as a guard at the Compton house demanded an additional fee. When they were unable to come up with the extra money, the smuggler, known as Pablo and later determined to be a close associate of Gamez Reyes, threatened to kill them. The children gave the note to a neighbor, who contacted the Compton house owner's daughter, who alerted the owner. Concerned, the owner called Gamez Reyes, who assured the owner no one was being held captive. Nonetheless, the owner notified Gamez Reyes that she had called the police and that officers were on their way.

Later that day, ICE agents arrived at the Compton stash house, followed by Los Angeles police officers and sheriff's deputies. Upon the agents' arrival, numerous individuals ran out of the house, and a dog charged at the officers. The officers shot the dog and ultimately arrested eighteen aliens from the stash house and one member of the alien smuggling operation. Among the eighteen arrested aliens were two young brothers from Ecuador, later determined to be thirteen and fifteen years old. Local residents in the Compton neighborhood discovered the two boys hiding in an abandoned house shortly after the raid and brought them to the ICE agents. During an interview with ICE agents the day after the raid, one of the boys explained that their father resided in Ecuador, that their undocumented mother lived in New York, and that he and his brother traveled to the United States with their cousin. An attempt to reach the boys' mother by phone was unsuccessful.

Police later discovered that, after the raid on the Compton stash house, Gamez Reyes signed a lease for a new stash house in Lynwood, California. Between January 2010 and March 2011, ICE agents executed search warrants on the Lynwood stash house and two other houses in southern California, after receiving phone calls from concerned relatives that smuggled aliens were being held against their will inside the houses. Agents found thirty-seven, thirty-five, and seven smuggled aliens in stash houses located in Lynwood, Baldwin Park, and Hesperia, California, respectively. At each location, the agents arrested several members of the smuggling ring acting as guards, and they recovered smuggling ledgers, known as "pollo books," with several hundred names of smuggled aliens and payment information. Gamez Reyes's name, or his moniker, "Chapo," appeared in connection with 142 distinct entries in the smuggling ledgers. His name was also mentioned in MoneyGram records and interviews with the aliens. Gamez Reyes was arrested at his home in Compton, California, on March 18, 2011, pursuant to a federal arrest warrant for an unrelated illegal reentry offense.

Gamez Reyes was charged in a seven-count indictment. Counts one through six charged Gamez Reyes with harboring and concealing illegal aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(B)(i). Count seven charged Gamez Reyes with concealing, harboring, and shielding an alien from detection, during and in relation to which he caused serious bodily injury to the alien.[3] After

---

[3] This count stemmed from allegations that Gamez Reyes sexually assaulted two female aliens while they were held at the Compton stash house. Gamez Reyes disputed these claims, and after an investigation, the government was unable to conclude any sexual assaults took place. One

entering into plea negotiations with the government, Gamez Reyes pleaded guilty to counts one through six, and the government dismissed count seven. The government agreed not to recommend a term of imprisonment higher than the low end of the applicable Sentencing Guidelines range, and the parties agreed not to seek any other specific offense characteristics, adjustments, or departures. The plea agreement acknowledged, however, that the district court was not a party to the agreement, that it could determine the appropriate sentencing range, and that it was not bound by any of the parties' recommendations.[4] *See* Fed. R. Crim. P. 11(c)(1)(B). Gamez Reyes further confirmed at his change-of-plea hearing that he understood that the plea agreement did not bind the district court and that the district court retained discretion to impose a sentence it deemed appropriate.

After Gamez Reyes pleaded guilty, the United States Probation Office prepared a presentence report ("PSR"). The

---

of the women was unable to identify Gamez Reyes in a photographic lineup as her assailant. The other woman claimed that the alleged assault took place inside the stash house but Gamez Reyes claimed it was consensual sex at a hotel. Gamez Reyes passed a polygraph test, and the government obtained a hotel registration consistent with Gamez Reyes's account. After lengthy discussion at sentencing, the district court ultimately credited Gamez Reyes's claim that he engaged in sexual conduct with the alien at a hotel, but the court did not credit his claim that the sexual conduct was a voluntary act on behalf of the alien. The district court did not rely on the sexual assault allegations when it imposed the enhancements discussed in this appeal.

[4] By contrast, a plea agreement executed pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) provides that where the parties "agree that a specific sentence . . . is the appropriate disposition of the case . . . such a recommendation or request binds the court once the court accepts the plea agreement."

PSR recommended a two-level enhancement for smuggling, transporting, or harboring an unaccompanied minor. This recommendation was based on evidence that agents had apprehended the thirteen- and fifteen-year-old minors during the raid of the Compton stash house and evidence that the minors were unaccompanied by a parent or grandparent. The PSR also recommended a two-level enhancement for involuntarily detaining an alien through coercion or threat, or in connection with a demand for payment. This recommendation was based on (1) evidence that the two women who threw the note out of the window at the Compton stash house were detained in the stash house after smugglers raised their fee; (2) indications in the note itself that immigrants were being held against their will in the stash house; and (3) the fact that Gamez Reyes admitted to overseeing the stash houses and collecting fees. In recommending these enhancements, the PSR applied the "Relevant Conduct" guideline at U.S.S.G. § 1B1.3(a), which holds a defendant accountable for reasonably foreseeable actions or omissions of others committed in furtherance of a jointly undertaken criminal activity.

At sentencing, Gamez Reyes objected to the enhancements, and, consistent with the plea agreement, the government also argued against imposing the enhancements.[5] With respect to the unaccompanied minor enhancement, the

---

[5] The government argues on appeal that the district court did not clearly err in applying the enhancements. In the plea agreement, the parties agreed that they both maintained the right to "argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error." *See United States v. Rodriguez-Castro*, 641 F.3d 1189, 1192 (9th Cir. 2011) (government did not breach plea agreement by arguing on appeal in support of sentence imposed by district court).

government argued that there was little evidence that the age of the two minor boys or their relationship to the other aliens in the house was reasonably foreseeable to Gamez Reyes, and noted that this particular alien smuggling ring did not focus on smuggling minors into the country. But the government also conceded that none of the aliens recovered from the Compton stash house shared a last name with the two boys, and that the organization's only requirement for smuggling an alien was the alien's ability to pay the fee. With respect to the involuntary detention enhancement, the government conceded that some aliens' fees were increased once they arrived in the United States, but argued that there was little evidence Gamez Reyes knew or reasonably should have known about the increased fees. The government also argued that it is a normal incident of smuggling operations that the aliens are held in custody until they pay the agreed-upon fee. After listening to arguments from both parties in two lengthy hearings, and after reviewing the PSR, sentencing memoranda, and ICE investigative reports on which the probation officer relied, the district court denied Gamez Reyes's objections, imposed the two disputed enhancements and a third enhancement for an aggravated role in the offense, and sentenced Gamez Reyes to ninety-six months' imprisonment, at the top of the Sentencing Guidelines range.

## II.  DISCUSSION

### A.  Standard of Review

We review de novo a district court's interpretation of the Sentencing Guidelines, and we review for clear error its factual findings. *See United States v. Rivera-Alonzo*, 584 F.3d 829, 836 (9th Cir. 2009). Thus, we review for clear error the district court's finding that it was reasonably

foreseeable to Gamez Reyes that the ring would smuggle unaccompanied minors and involuntarily detain aliens in the stash houses.[6]   Under the clearly erroneous standard, "[s]o long as the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently had it sat as the trier of fact." *United States v. Gust*, 405 F.3d 797, 799 (9th Cir. 2005) (citation and internal quotation marks omitted).   We have previously identified an intracircuit split on whether the proper standard of review of the application of the Sentencing Guidelines to the facts is de novo or abuse of discretion, *see United States v. Tanke*, 743 F.3d 1296, 1306 (9th Cir. 2014), but we need not resolve the issue here because our decision would be the same under either standard of review. *See id.*

## B.  Unaccompanied Minor Enhancement

The Sentencing Guidelines provide for a two-level enhancement "[i]f the defendant smuggled, transported, or harbored a minor who was unaccompanied by the minor's parent or grandparent." U.S.S.G. § 2L1.1(b)(4).  A minor is defined as "an individual who had not attained the age of 16 years." *Id.*, cmt. n.1.  As in the PSR, when the district court imposed this enhancement it relied on the "Relevant

---

[6] The government argues that the plain error standard of review should apply with respect to Gamez Reyes's challenge to the unaccompanied minor enhancement, because Gamez Reyes raises a new legal argument in his opening brief on appeal that he did not raise before the district court. We reject this contention. *See Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013) ("[W]e may consider new legal arguments raised by the parties relating to claims previously raised in the litigation."); *see also United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) ("[I]t is claims that are deemed waived or forfeited, not arguments.").

Conduct" guideline, U.S.S.G. § 1B1.3(a)(1)(B). Section 1B1.3(a)(1)(B) provides that in the case of a jointly undertaken criminal activity, whether or not it is charged as conspiracy, a particular special offense characteristic should be determined based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." On appeal, Gamez Reyes does not dispute that unaccompanied minors were found at the Compton stash house. Instead, he disputes whether it was reasonably foreseeable to him that the unaccompanied minors would be there. In particular, he contends that, rather than applying the "reasonably foreseeable" standard, the district court effectively applied a "strict liability" standard, because it relied chiefly upon the sheer volume of aliens smuggled annually to conclude that it was reasonably foreseeable unaccompanied minors would also be smuggled.

We conclude that the district court applied the proper legal standard and did not clearly err in imposing the unaccompanied minor enhancement, despite the government's argument at sentencing that it was not reasonably foreseeable to Gamez Reyes that unaccompanied minors would be smuggled. The district court relied in part on the large size of this alien smuggling ring to find that "it was reasonably foreseeable for [Gamez Reyes] to have known that the minors were [at the Compton location]." But the district court also relied on Gamez Reyes's familiarity with the circumstances of the Compton stash house: he located and leased the house, he went to the house a number of times, and there were fewer aliens held in that stash house compared to the other houses. The district court also

considered that this particular smuggling organization had no system in place to ensure that any minor aliens were accompanied; instead, all that was required was payment of the smuggling fee. Therefore, the district court did not apply a "strict liability" standard. It properly looked at the particular circumstances of this alien smuggling ring and Gamez Reyes's role within it to conclude that it was reasonably foreseeable to Gamez Reyes that unaccompanied minors would be present.

Nonetheless, Gamez Reyes insists that "it was not an obvious fact" that the two minor brothers were traveling unaccompanied. But it did not need to be "obvious" to Gamez Reyes that unaccompanied minors were being held in the Compton house, only "reasonably foreseeable." *See* U.S.S.G. § 1B1.3(a)(1)(B). The Guidelines provide an instructive and analogous example of when a defendant can be held accountable for the conduct of others:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he

is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3 cmt. n.2(c)(6); *see also Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."). Gamez Reyes admitted that he collected the smuggling fees, that he processed the fees through MoneyGram and Western Union, and that he was paid in cash "from the organization in exchange for his participation in the smuggling organization." As the district court noted, he was a frequent visitor to the Compton stash house and he was in frequent contact with the head of the organization and the guards stationed at the stash houses. Like "Defendant Q" in the example above, Gamez Reyes pooled his resources and profits with the other members of the smuggling ring. Coupled with the size of this organization, Gamez Reyes's significant role within it, the lack of any screening mechanism to prevent unaccompanied minors, and Gamez Reyes's intimate knowledge of the circumstances in the Compton stash house, it was plausible for the district court to conclude that Gamez Reyes could reasonably have foreseen that other members of this smuggling ring might smuggle unaccompanied minors, either by act or omission. Accordingly, the district court did not clearly err by imposing this enhancement. *See, e.g.*, *United States v. Dallman*, 533 F.3d 755, 760 (9th Cir. 2008) (district court did not err in

holding defendant accountable for the aggregate amount of marijuana carried by all coconspirators in attempt to import marijuana into the United States because coconspirators coordinated importation efforts, aided each other in crossing a barbed wire fence at the border, and together attempted to hide from Border Patrol agents); *United States v. Lavender*, 224 F.3d 939, 941–42 (9th Cir. 2000) (district court's finding that it was reasonably foreseeable coconspirator would carry and use a dangerous weapon during a bank robbery was not clearly erroneous); *United States v. Willis*, 899 F.2d 873, 875 (9th Cir. 1990) (district court properly held wife accountable for husband's possession of a firearm in a narcotics trafficking organization because the husband's gun was plainly visible and coconspirators were few in number and knew each other well, such that the court could infer that each participant knew the others' "methods of operation"); *see also United States v. Rodriguez*, 525 F. App'x 268, 270 (5th Cir. 2013) (per curiam)(district court did not err in finding reasonably foreseeable that a minor alien would be among those harbored where smuggling organization was not restricted by age).

Finally, and contrary to Gamez Reyes's contention, the district court's finding comports with due process. To prevail on a due process claim, Gamez Reyes must demonstrate that his sentence was based on false or unreliable information. *See United States v. Vanderwerfhorst*, 576 F.3d 929, 935–36 (9th Cir. 2009). Challenged information is deemed false or unreliable if it lacks "some minimal indicium of reliability beyond mere allegation." *Id.* (internal quotation marks omitted). Gamez Reyes has not met this burden. The district court relied on Gamez Reyes's own admissions that the organization smuggled in approximately 2,000 aliens annually, that he rented the Compton house where the two

minor boys were held, that he oversaw the maintenance and operation of the stash houses, and that he personally collected smuggling fees. The district court also fairly relied on both the PSR and the underlying ICE investigative reports submitted by the probation officer. *See United States v. Burns*, 894 F.2d 334, 336–37 (9th Cir. 1990) (no error in considering Secret Service investigative report at sentencing). In particular, the district court noted that those investigative reports included information that Gamez Reyes came to the Compton stash house on a regular basis and that, on the day of the raid, Gamez Reyes arrived at the Compton house to retrieve and drive away with a guard named Pablo immediately before officers arrived. Additionally, the district court relied on the juvenile's statement to the authorities that he and his brother were not accompanied by their parents.[7] These facts, which Gamez Reyes does not dispute, bear sufficient indicia of reliability, and the district court did not err in relying on them to impose the enhancement.

## C. Involuntary Detention Enhancement

The Guidelines provide for a two-level enhancement "[i]f an alien was involuntarily detained through coercion or threat, or in connection with a demand for payment, (i) after the alien was smuggled into the United States; or (ii) while the alien was transported or harbored in the United States." U.S.S.G. § 2L1.1(b)(8)(A). The district court found that aliens were involuntarily detained both in connection with a

---

[7] Gamez Reyes does not challenge the credibility of that statement on appeal. He did challenge the statement before the district court, but his conclusory argument that "juveniles can easily lie for a wide variety of reasons," is not persuasive and does not demonstrate that this evidence was false or unreliable.

demand for payment and through coercion or threat. As with the unaccompanied minor enhancement, the district court applied the "reasonably foreseeable" test articulated in section 1B1.3(a)(1)(B) to impose the involuntary detention enhancement.

The district court did not clearly err in finding that this particular smuggling organization detained aliens both in connection with a demand for payment and through coercion or threat. The investigation into this smuggling organization began after two women threw a note out of a barred window claiming they were being held captive. It is undisputed that the Compton stash house had bars on the windows, guards on watch, locks on the doors, an aggressive pitbull, and an unloaded rifle in plain sight. In their interviews with ICE agents, the aliens provided further information about the Compton stash house conditions. One alien claimed that a guard sat next to the door to prevent the aliens from leaving and that he also controlled access to the bathroom. One of the women who threw the note out of the window claimed that men arriving at the house were instructed to remove their shoes, shirts, and belts; when one man inquired why, a guard beat him. She also described a guard restricting use of the bathroom and shower, and she observed the guard named Pablo walk around with a pistol. Both of the women who threw out the note stated that Pablo doubled their smuggling fee once they arrived and told them that if they tried to escape they would be killed. An alien who was held for four months at the Lynwood stash house told ICE agents that he witnessed a guard threaten female aliens that if they wanted a shower, blankets, or a jacket, they had to have sex with the guard. He also witnessed guards carrying guns, and when he attempted to escape, one of the guards caught him, threw him in a closet, and punched him in the face.

As our sister circuits have recognized, these are coercive and threatening conditions. *See, e.g.*, *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1217–19 (10th Cir. 2008) (involuntary detention enhancement properly applied where aliens forced at gunpoint to give up their personal belongings and phone family members and friends for additional money to pay the smugglers, had to remain hidden in the stash houses without food or drink, were not free to leave, and feared for their lives and physical safety); *United States v. DeLeon*, 484 F. App'x 920, 934 (5th Cir. 2012) (per curiam) (exits of stash house were boarded up and/or padlocked from the outside to prevent escape); *United States v. Gonzalez-Mendoza*, 401 F. App'x 997, 998 (5th Cir. 2010) (per curiam) (aliens detained in stash houses under armed guard, smugglers demanded additional payments, and firearms located in stash houses).

Further, the district court did not clearly err, despite the government's recommendation against applying an involuntary detention enhancement, in finding that it was reasonably foreseeable to Gamez Reyes that the organization would detain aliens through coercion or threat or in connection with a demand for payment. Gamez Reyes was a frequent visitor to the Compton house, where he would have witnessed the aliens without shoes, the bars on the windows, guards keeping watch, the aggressive dog, and a gun in plain sight. He was directly responsible for securing the stash houses, was in constant contact with the guards, and significantly, was in charge of collecting the smuggling fees. The evidence shows that Gamez Reyes was in particularly close contact with the guard named Pablo, who threateningly demanded additional smuggling fees. Even if Gamez Reyes did not personally threaten any aliens, demand additional payments, or condone the guards' demands of sexual favors

from female aliens in return for bathroom privileges, it was reasonably foreseeable to him that others in the smuggling ring would use these threatening tactics to detain the aliens. *See* U.S.S.G. § 1B1.3 cmt. n.2(c)(6); *see also Alapizco-Valenzuela*, 546 F.3d at 1219 (district court reasonably inferred defendant knew aliens were being held against their will when he arrived at a stash house and saw aliens without shoes or personal belongings and armed guards keeping watch over them). Therefore, the district court did not err in imposing the involuntary detention enhancement. *See, e.g.*, *United States v. Miguel*, 368 F.3d 1150, 1156 (9th Cir. 2004) (district court properly found it reasonably foreseeable that child transported through desert in alien smuggling organization would sustain bodily injury); *United States v. Li*, 206 F.3d 78, 86 (1st Cir. 2000) (district court did not err in finding that "shoddy conditions, meager provisions, and inadequate safety measures" on ship smuggling Chinese nationals into United States were reasonably foreseeable to defendants, even those defendants not present on the ship).

## III. CONCLUSION

The district court did not clearly err in applying the two-level unaccompanied minor enhancement under U.S.S.G. § 2L1.1(b)(4) or the two-level involuntary detention enhancement under U.S.S.G. § 2L1.1(b)(8)(A), because it was not bound by the plea agreement to accept the parties' recommendations, it conducted a careful, thorough review of all the relevant information in the plea agreement, PSR, and underlying ICE investigation reports, and it properly applied

the reasonably foreseeable standard dictated by U.S.S.G. § 1B1.3(a)(1)(B) to those facts.  There was no error, clear or otherwise.  Accordingly, we affirm the sentence.

**AFFIRMED.**